**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RONALD WORSHAM,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | |
| | * | **CIVIL ACTION NO. 20-00384-B** |
| **KILOLO KIJAKAZI,** | * | |
| **Acting Commissioner of** | * | |
| **Social Security,** | * | |
| | * | |
| **Defendant.** | * | |

**ORDER**

Plaintiff Ronald Worsham ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying his claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq*.  On November 3, 2021, the parties consented to have the undersigned Magistrate Judge conduct any and all proceedings in this case.  (Doc. 18).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (Doc. 19).  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

I.   **Procedural History**[1]

Plaintiff protectively filed his application for benefits on July 17, 2017, alleging disability beginning October 30, 2014, based on right knee pain and inability to squat. (Doc. 13 at 55-56, 154, 184).   Plaintiff later amended his alleged disability onset date to December 15, 2017. (Id. at 39-40, 175).  Plaintiff's application was denied at the initial stage.  (Id. at 63, 65). Upon Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on December 12, 2019.  (Id. at 36, 72, 119).  Plaintiff, who was represented by counsel, attended the hearing in person and provided testimony related to his claims. (Id. at 38-49).  A vocational expert ("VE") also testified at the hearing.  (Id. at 50-53).  On January 2, 2020, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 14-24).   The Appeals Council denied Plaintiff's request for review on June 26, 2020; therefore, the ALJ's decision became the final decision of the Commissioner.  (Id. at 5).

Having exhausted his administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  Oral argument was conducted on December 1, 2021.  (Doc. 21).  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. § 405(g).

---

[1] The Court's citations to the transcript in this order refer to the pagination assigned in CM/ECF.

## II.  <u>Issue on Appeal</u>

> **Whether the ALJ's evaluation of the medical opinion evidence and RFC determination are supported by substantial evidence?**

## III. <u>Factual Background</u>

Plaintiff was forty-one years of age at the time of his hearing before the ALJ. (Doc. 13 at 41). Plaintiff completed the eleventh grade but did not graduate from high school. (<u>Id.</u> at 41, 185). He worked as a joiner at a shipyard from 1996 to October 2014. (<u>Id.</u> at 41, 185).

Plaintiff testified that he is unable to work because of pain in his right knee and lower back.[2] (<u>Id.</u> at 43-44). The record reflects that a joiner door fell on Plaintiff's knee at work on October 30, 2014. (<u>Id.</u> at 284-85, 292, 400). Plaintiff reported that he did not return to work and lost his job as a result. (<u>Id.</u> at 400). Plaintiff reported pain, difficulty walking, and inability to flex his right knee as a result of the incident. (<u>Id.</u> at 268-69, 273, 276, 284-85, 292, 307, 316, 452, 455-56, 460, 464-65, 467-68). Plaintiff's right knee has been treated with medication, injections, physical therapy, and bracing. (<u>Id.</u> at 270-77, 297, 309, 312, 314-15, 452, 454-55, 457, 460, 462, 464-65, 467-68). Plaintiff began reporting lower back pain in December

---

[2] Specifically, when asked what his main problem is, Plaintiff testified: "Both [my right knee and back] together. Knees start hurting and then goes to my back, and in my back." (Doc. 13 at 43-44).

2017, which has been treated with medication, physical therapy, and a trigger point injection.  (Id. at 312, 314-16, 318, 452, 454-55, 460, 462, 464-65, 467).  Plaintiff began mental health treatment in November 2017 and was prescribed medication for depression and insomnia.  (Id. at 337, 400-03).

## IV.   Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining (1) whether the decision of the Commissioner is supported by substantial evidence and (2) whether the correct legal standards were applied.[3]  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).  "Substantial evidence is more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  In determining whether substantial evidence exists,

---

[3] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

a reviewing court must consider the record as a whole, taking into account evidence both favorable and unfavorable to the Commissioner's decision. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, at *4 (S.D. Ala. June 14, 1999).

## V.   Statutory and Regulatory Framework

An individual who applies for Social Security disability benefits must prove his disability. See 20 C.F.R. § 404.1512. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The Social Security regulations provide a five-step sequential evaluation process for determining whether a claimant has proven his disability. See 20 C.F.R. § 404.1520.

Under this process, the claimant must first prove that he has not engaged in substantial gainful activity during the relevant period. Carpenter v. Comm'r of Soc. Sec., 614 F. App'x 482, 486 (11th Cir. 2015) (per curiam).[4]   The second step requires the

---

[4] Federal Appendix cases are unpublished Eleventh Circuit opinions and are not considered binding precedent, but they may be cited as persuasive authority. 11th Cir. R. 36-2; Henry v. Comm'r of Soc. Sec., 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases

claimant to prove that he has a severe impairment or combination of impairments. Id. If, at the third step, the claimant proves that his impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. Id. If the claimant cannot prevail at the third step, the evaluation proceeds to step four, where the claimant must prove an inability to perform his past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). At the fourth step, the ALJ must determine the claimant's residual functional capacity ("RFC"). See Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004). A claimant's RFC is an assessment, based on all relevant medical and other evidence, of a claimant's remaining ability to work despite his impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

If the claimant meets his burden at the fourth step, the burden temporarily shifts to the Commissioner to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment that exists in significant numbers in the national economy, given the claimant's RFC, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985) (per curiam). If the Commissioner can demonstrate that there

---

printed in the Federal Appendix are cited as persuasive authority.").

are such jobs the claimant can perform, the burden then shifts back to the claimant to prove his inability to perform those jobs in order to be found disabled. <u>Goode v. Comm'r of Soc. Sec.</u>, 966 F.3d 1277, 1279 (11th Cir. 2020).

## VI.   <u>The ALJ's Findings</u>

In this case, the ALJ found that Plaintiff has the severe impairments of partial ACL tear and thinning of cartilage of the patella in the right knee, degenerative disc disease of the lumbar spine, and depression, along with the non-severe impairments of hemorrhoids and gastritis. (Doc. 13 at 16). The ALJ found that Plaintiff's impairments, when considered individually and in combination, do not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (<u>Id.</u> at 17). The ALJ determined that Plaintiff has the RFC to perform a reduced range of light work, with the following limitations: he can lift and carry up to twenty pounds occasionally and ten pounds frequently; he cannot climb ladders, ropes, or scaffolds; he can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; he must avoid work at unprotected heights and concentrated exposure to other hazards; and he is limited to unskilled work. (<u>Id.</u> at 18). Based on the VE's testimony and the record before him, the ALJ found that Plaintiff is unable to perform his past relevant work as a joiner but can perform other jobs that exist in

significant numbers in the national economy, such as laundry worker, hand packager, and box printer. (Id. at 22-23). Thus, the ALJ concluded that Plaintiff is not disabled. (Id. at 23-24).

## VII. Discussion

Plaintiff's sole claim on appeal is that the ALJ's RFC[5] assessment is not supported by substantial evidence because the ALJ improperly rejected opinions offered by two of his treating physicians and improperly found the prior administrative medical findings of a non-examining State agency medical reviewer to be persuasive despite the fact that the findings were reached before the medical record had been fully developed. (Doc. 14 at 2-6). Defendant counters that the ALJ properly evaluated the persuasiveness of the medical opinions and prior administrative medical findings, and that the ALJ's RFC assessment and evaluation of the opinion evidence are supported by substantial evidence. (Doc. 15 at 4-15). Having carefully reviewed the record, the Court

---

[5] RFC is a measure of what a claimant can do despite his credible limitations. See 20 C.F.R. § 404.1545. Determinations of a claimant's RFC are reserved for the ALJ, and the assessment is to be based upon all the relevant evidence of a claimant's remaining ability to work despite his impairments and must be supported by substantial evidence. See Beech v. Apfel, 100 F. Supp. 2d 1323, 1331 (S.D. Ala. 2000) (citing 20 C.F.R. § 404.1546 and Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)); Saunders v. Astrue, 2012 U.S. Dist. LEXIS 39571, at *9-10, 2012 WL 997222, at *3-4 (M.D. Ala. Mar. 23, 2012). Once the ALJ has determined the claimant's RFC, the claimant bears the burden of demonstrating that the ALJ's decision is not supported by substantial evidence. See Flynn v. Heckler, 768 F.2d 1273, 1274 (11th Cir. 1985) (per curiam).

finds that Plaintiff's claim is without merit.

**A.  *The Applicable Regulations.***

The Social Security Administration revised its regulations regarding the evaluation of medical evidence for all claims filed after March 27, 2017.  See 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132, 2017 WL 1105368 (Mar. 27, 2017)).  Because Plaintiff filed his application in July 2017, the revised regulations apply in this case.

The new regulations direct ALJs to no longer "defer or give any specific evidentiary weight, including controlling weight," to any medical opinions or prior administrative medical findings, including those from a treating physician.  See 20 C.F.R. § 404.1520c(a); Lopez v. Saul, 2020 U.S. Dist. LEXIS 186793, at *37, 2020 WL 7016791, at *12 (S.D. Fla. July 24, 2020) (noting that the revised standard "eliminates the 'treating physician rule' that accords more weight to those medical opinions of treating physicians"), report and recommendation adopted, 2020 U.S. Dist. LEXIS 186294, 2020 WL 5938772 (S.D. Fla. Oct. 7, 2020).  Instead, ALJs must apply the same factors in the consideration of all medical opinions and prior administrative medical findings.  See 20 C.F.R. § 404.1520c(a); Purdy v. Berryhill, 887 F.3d 7, 13 n.8 (1st Cir. 2018) (noting that "medical opinions and findings are [now] evaluated for their persuasiveness according to a uniform

set of considerations").

Under the new regulations, ALJs must "evaluate the persuasiveness of medical opinions and prior administrative medical findings" by considering the following five factors, as appropriate: (1) supportability, (2) consistency, (3) relationship with the claimant,[6] (4) specialization, and (5) other factors.[7] 20 C.F.R. § 404.1520c(a), (c). Supportability and consistency are the most important factors, and ALJs are required to explain how they considered those factors in evaluating the persuasiveness of a medical source's opinion. Id. at § 404.1520c(a), (b)(2). ALJs may also explain how they considered the remaining factors, as appropriate, but they are generally[8] not required to do so. Id.

---

[6] The relationship with the claimant factor combines consideration of the following issues: length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship. See 20 C.F.R. § 404.1520c(c)(3)(i)-(v).

[7] The "other factors that tend to support or contradict a medical opinion or prior administrative medical finding" include, but are not limited to, the medical source's "familiarity with the other evidence in the claim" or "understanding of our disability program's policies and evidentiary requirements." When considering a medical source's familiarity with the other evidence in the claim, ALJs must consider whether new evidence received after the medical source made his or her medical opinion or finding makes the medical opinion or finding more or less persuasive. 20 C.F.R. § 404.1520c(c)(5).

[8] If two or more different medical opinions about the same issue are equally well-supported and consistent with the record, the ALJ must also articulate how the other most persuasive factors in 20 C.F.R. § 404.1520c(c)(3)-(5) were considered in evaluating the

at § 404.1520c(b)(2).

**B.   *The Medical Evidence.***

The record reflects that Plaintiff presented to American Family Care on November 3, 2014, reporting right knee pain after a door fell on his knee four days earlier.   (Doc. 13 at 307). Plaintiff reported that he was unable to bear weight and unable to fully flex his right knee.   (Id.).   On examination, it was noted that Plaintiff had a right-sided limp, bruising over his right medial knee joint, tenderness and pain with palpation over his right medial knee, and abnormal range of motion and pain with flexion of his right knee.   (Id. at 308).   However, an x-ray of Plaintiff's right knee revealed normal alignment, no evidence of fracture, and no effusion.   (Id. at 309).   Plaintiff was given a Ketorolac Tromethamine injection, crutches, a hinged knee brace, and prescriptions for Mobic and Norco.   (Id.).   On November 20, 2014, Plaintiff returned to American Family Care for a follow-up but left before being seen.   (Id. at 306).

On July 30, 2015, Plaintiff presented to orthopedist James Cockrell, M.D., and reported continuing problems with his right knee following the incident nine months earlier, including pain that was primarily medial in nature and an inability to "really bend" his knee.   (Id. at 269).   Plaintiff denied receiving medical

_____

relative persuasiveness of those opinions.   20 C.F.R. § 404.1520c(b)(3).

treatment for his knee up to that point, stating that there was "an issue with the workman's comp because he did not report it right away and they did not authorize treatment until now." (Id.). On examination, Dr. Cockrell noted that Plaintiff was alert and oriented, in no distress, entered the room unassisted, had no warmth, erythema, or effusion in his knees, and had no detectible gross instability. (Id.). However, he noted that Plaintiff had some medial joint line tenderness and "will only flex the knee to about 20 degrees on the right." (Id.).

Dr. Cockrell ordered an MRI of Plaintiff's right knee, which was performed on August 5, 2015, and was "within normal limits." (Id. at 269, 278). At a post-MRI follow-up on September 28, 2015, Plaintiff had no effusion but continued to report swelling and inability to bend his right knee. (Id. at 268). Plaintiff stated that his knee swelled if he left his brace off, and Dr. Cockrell instructed him to "leave his brace off for a few days and if it swells up on him . . . I want to see it personally." (Id.). Dr. Cockrell placed Plaintiff on Mobic and ordered physical therapy for two to three times per week for three to four weeks.[9] (Id. at 268, 272).

On November 5, 2015, Dr. Cockrell participated in a rehab conference with Plaintiff's worker's compensation nurse case

---

[9] Plaintiff subsequently reported that he attended only "3 physical therapy sessions with 13 sessions planned." (Doc. 13 at 292).

manager.  (Id. at 267).   In his note from that conference, Dr. Cockrell stated that Plaintiff's current treatment and need for treatment were not related to the workplace, that he felt Plaintiff had reached maximum medical improvement, and that he could "find no clinical reasons to explain" Plaintiff's complaints or symptoms.  (Id.).

On September 22, 2017, Plaintiff presented to Kevin P. Michaels, M.D., and Mable J. Elkins, CRNP, for a consultative medical examination.  (Id. at 292-96).  Plaintiff reported that he had continued to use a right knee brace, and that he continued to have difficulty flexing his right knee and pain with movement. (Id. at 292).  He wore the brace to the examination and reported that he used over-the-counter Goody's powder for pain.  (Id.).  On examination, Plaintiff was alert, oriented, calm, and pleasant, with good eye contact and subject focus; he displayed clear speech; his clothing was clean and appropriately fitted; he had normal range of motion of his lower back; no back muscle spasms were appreciated; he had normal Romberg and negative straight leg raise tests bilaterally; and he exhibited normal stride, speed, and gait with the exception of the use of the right knee brace with ambulation.  (Id. at 293).  Plaintiff's bilateral posterior tibias were palpable with no pedal edema present; he had normal range of motion of both hips and ankles with no complaints of pain; his lower extremity strength to resistance was 5/5 bilaterally; and he

had negative ballottement for both knees. (Id.). The examiners noted that Plaintiff had "decreased flexion of the right knee demonstrated as passive as well as active movement.[10]  However well-developed musculature bilateral thighs." (Id.).

The examiners diagnosed Plaintiff with right knee pain, reflux, and a history of gastric ulcers. (Id. at 294). They stated that Plaintiff's "only medical concern that limits occupation opportunities is right knee pain and limitation in mobility," suggested that the disability service "may want to consider a repeat MRI" of the right knee to assess any current abnormalities, and stated that Plaintiff may benefit from a work hardening physical therapy program to increase flexibility and mobility if the MRI did not show abnormalities. (Id.). They concluded: "Otherwise, there are few objective physical limitations to activities or restrictions in mobility." (Id.).

On December 15, 2017, Plaintiff presented to internal medicine physician Barbara C. Mitchell, M.D., to establish care for knee and back pain. (Id. at 316). He reported an inability to bend his right knee, difficulty walking, mild pain in his back, and some pain in his right thigh. (Id.). Dr. Mitchell noted on

---

[10] Plaintiff's right knee flexion was forty degrees out of a normal range of 150 degrees, but his range of motion findings were otherwise normal in all areas, including right knee extension. His grip strength and dexterity were also normal. (Doc. 13 at 295-96).

examination that Plaintiff was alert and oriented; had normal mood, affect, behavior, and thought content; had normal reflexes; and had no swelling or redness but was unable to bend his right knee. (Id. at 317-18).  Dr. Mitchell assessed Plaintiff with chronic right knee pain, a right knee held in chronic extension, resulting gait instability, and mild back pain.  (Id. at 318).  She ordered x-rays of Plaintiff's right knee and lumbar spine.  (Id.).  Right knee x-rays showed an intact patella, no large joint effusion, and no acute displaced fracture.  (Id. at 321).  Lumbar spine x-rays revealed anatomic posterior alignment, no subluxation, questionable transitional lumbosacral vertebra, minimal discogenic degenerative changes, no endplate destruction, no focal wedging, and no compression deformity.  (Id. at 319).

On December 15, 2017, the date she first treated Plaintiff, Dr. Mitchell completed a Medical Assessment Report for Plaintiff's disability claim.  (Id. at 297).  In the form, Dr. Mitchell listed Plaintiff's diagnoses as knee pain, gait instability, and chronic back pain, indicated that he would require follow-up medical treatment on a monthly basis, and stated that his onset date of disability was October 30, 2014.  (Id.).  Dr. Mitchell checked boxes indicating that Plaintiff could not perform normal work-related activities for six to eight hours in an average workday; that Plaintiff's work-related restrictions would cause him to miss four or more days of work per month; that Plaintiff's functional

abilities could not be expected to substantially improve in the next twelve months; and that Plaintiff's work-related restrictions were exclusively physical in nature.  (Id.).

On January 19, 2018, Plaintiff presented to orthopedist Joseph Grant Zarzour, M.D.  (Id. at 467).  He reported "9/10 pain in his back and right knee" and pain in his right hip.  (Id.). Dr. Zarzour noted that Plaintiff "really has very minimal motion" in his right knee.  (Id.).  On examination, Dr. Zarzour noted that Plaintiff was well-developed, well-nourished, alert, in no acute distress, and exhibited appropriate mood and affect and communication within normal limits.  (Id. at 468).  Plaintiff was tender to palpation in the lumbar spine and paraspinal musculature and in the medial and lateral joint lines of his right knee; his right knee range of motion was zero to thirty degrees; he was stable to varus and valgus stress; all toes were sensate; skin was intact; and he had an antalgic gait "secondary to pain."  (Id.). Lumbar spine x-rays showed L5-S1 mild degenerative disc disease with subchondral sclerosis, and right knee x-rays showed mild right-sided medial compartment osteoarthritis with subchondral sclerosis.  (Id.).  Dr. Zarzour assessed Plaintiff with lumbar degenerative disc disease and arthrofibrosis of the right knee joint, provided Plaintiff a short hinged knee brace, and ordered physical therapy.  (Id. at 468-69).

Plaintiff returned to Dr. Mitchell on March 2, 2018, with a

chief complaint of back pain. (Id. at 314). His physical examination was normal, and Dr. Mitchell added Gabapentin to his medication regimen. (See id. at 315).[11]

A week later, on March 9, 2018, Plaintiff was seen by Dr. Zarzour and reported that bracing and physical therapy[12] had not helped very much and that he would like to try some injections. (Id. at 464). Plaintiff denied fatigue and difficulty sleeping, and his physical examination was unchanged from his prior visit two months earlier. (See id. at 464-65, 468). Dr. Zarzour performed a right knee steroid injection and lumbar trigger point injection and instructed Plaintiff to continue physical therapy. (Id. at 465).[13]

On November 13, 2018, Plaintiff was admitted to Springhill Medical Center after reporting bloody stools and vomiting. (Id. at 421). There, Plaintiff stated that he "drinks a 12 pack of beer per day" and smokes one-and-a-half packs of cigarettes daily. (Id. at 421, 433). He denied depression and suicidal ideation and displayed normal affect and behavior. (Id. at 423). It was noted

---

[11] At Plaintiff's next scheduled appointment with Dr. Mitchell on September 14, 2018, he left before being seen. (Id. at 313).

[12] The administrative transcript does not include physical therapy records from this period. (See Doc. 13).

[13] On March 9, 2018, Dr. Zarzour concluded: "We will see him again in a few months." (Doc. 13 at 465). However, the record does not reflect that Plaintiff returned to Dr. Zarzour.

that Plaintiff moved all extremities well, walked frequently, was fully ambulatory, and had no mobility limitations. (Id. at 438, 440, 442, 450). It was also noted that Plaintiff had good muscle strength in all extremities; 5/5 strength in all muscle groups tested; full range of motion of all extremities; 2+ and normal reflexes; no focal weakness; no numbness or tingling; normal motor exam; and normal or steady gait. (Id. at 423, 428, 440-42). A pain assessment on Plaintiff's date of admission stated: "no pain[,]" and a pain scale listed a pain rating of zero. (Id. at 438, 451). An internal hemorrhoid was determined to be the cause of Plaintiff's bleeding, and he was discharged with a good prognosis on November 15, 2018. (Id. at 421-22).

On April 30, 2019, Plaintiff returned to Dr. Mitchell with a chief complaint of elevated blood pressure.[14] (Id. at 310). A review of Plaintiff's systems was positive for a gait problem but negative for psychiatric/behavioral problems. (Id.). Dr. Mitchell noted on examination that Plaintiff was alert and oriented; exhibited normal behavior and thought content; had normal musculoskeletal range of motion; had no edema or deformity; and had normal reflexes, no cranial nerve deficit, and normal coordination. (Id. at 311). She advised Plaintiff to discontinue

---

[14] Plaintiff's blood pressure reading was 152/102, and Dr. Mitchell diagnosed him with hypertension and prescribed Amlodipine. (Doc. 13 at 311-12).

NSAIDs given his history of gastrointestinal issues, restarted him on Gabapentin, wrote a one-time prescription for Norco, and referred him to pain management. (Id. at 312).

On May 15, 2019, Dr. Mitchell completed a Clinical Assessment of Pain form. (Id. at 298-99). In the form, Dr. Mitchell opined that Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities or work; that physical activity would cause an increase of pain to such an extent that bed rest and/or medication would be necessary; that the side effects of Plaintiff's prescribed medication would make him totally restricted and thus unable to function at a productive level of work; and that Plaintiff had an underlying medical condition consistent with his pain. (Id.).

On May 16, 2019, Dr. Mitchell completed a Physical Capacities Evaluation form ("PCE"), in which she opined that Plaintiff could sit for two hours at one time and a total of three hours in an eight-hour workday; stand for zero to one hour at one time and a total of one hour in an eight-hour workday; and walk for zero to one hour at one time and a total of one hour in an eight-hour workday. (Id. at 300). Dr. Mitchell opined that Plaintiff could lift up to ten pounds frequently; lift eleven to twenty pounds occasionally; never lift more than twenty pounds; carry up to ten pounds occasionally; and never carry more than ten pounds. (Id.). Dr. Mitchell opined that Plaintiff could use both hands but could

not use either foot for repetitive movements. (Id.). She further opined that Plaintiff could reach frequently, bend occasionally, and never stoop, squat, or climb. (Id.). Finally, Dr. Mitchell opined that Plaintiff had a total restriction as to activities involving unprotected heights and driving automotive equipment; a moderate restriction as to being around moving machinery and exposure to marked changes in temperature and humidity; and a mild restriction as to exposure to dust, fumes, and gases. (Id.).

On June 20, 2019, Plaintiff presented to Grant D. Stone, D.O., to establish pain management treatment. (Id. at 460). Plaintiff told Dr. Stone that the right knee injection performed by Dr. Zarzour in March 2018 had afforded fifty percent pain relief for two months, but the lumbar trigger point injection had not been helpful. (Id.). Plaintiff also reported that he had undergone "extensive" physical therapy "without gains" in 2018. (Id.). On examination, Dr. Stone noted that Plaintiff was alert and oriented and had normal mood, affect, and thought content. (Id. at 461). Plaintiff had no cyanosis, clubbing, or edema; no sensory deficit in his extremities; 2+ and symmetric reflexes; and 5/5 motor strength throughout his extremities. (Id. at 461-62). He exhibited no clonus or spasticity, negative Hoffman's, and downgoing Babinski bilaterally, but his right knee was extended during ambulation with a slight circumducted gait. (Id. at 462). An examination of the lumbar spine revealed full range of motion

in all planes; negative straight leg raise bilaterally; positive facet loading test on the right; negative FABER, FADIR, and Milgram's tests; normal curvature of the spine; tenderness to palpation of the right lumbar paraspinal muscles; and no tenderness to palpation of the bilateral sacroiliac joint, piriformis muscles, or bilateral trochanteric bursae. (Id.). An examination of the right knee showed no erythema, swelling, redness, crepitus, or joint instability, but there was decreased range of motion and minimal tenderness of the pes anserine, patellar tendon, and patellofemoral tendon. (Id.). Dr. Stone noted that there was "no explanation for his pain on plain xrays" and that "xrays of the right knee and [lumbar spine] from 2018 [were] normal." (Id. at 460, 462). Dr. Stone ordered x-rays of Plaintiff's lumbar spine and an MRI of Plaintiff's right knee, which he interpreted to show a "partial ACL tear" and "thinning of cartilage medial patella."[15]

---

[15] It was noted in the diagnostic report findings from Plaintiff's right knee MRI on July 12, 2019 that "[p]artial tearing is seen along the course the ACL." (Doc. 13 at 458). The MRI impression states:

> 1. 1.2 x 1.3 cm chondral defect to the medial patella facet.
> 2. Acute on chronic strain to the ACL.
> 3. Truncation to the body of the medial meniscus with slight thinning of the articular cartilage of medial femoral condyle.
> 4. Small fluid collection interposed between iliotibial band and lateral femoral condyle which may present mild iliotibial band syndrome if the patient is symptomatic.
> 5. Mild strain to the distal myotendinous junction of the vastus medialis.

(Id. at 457, 462).

When Plaintiff returned to Dr. Stone on August 30, 2019, his chief complaint was his lower back.  (Id. at 455).  On examination, Dr. Stone noted markedly reduced lumbosacral spine range of motion, marked pain on range of motion, positive right-sided straight leg raise, positive facet-loading maneuvers, antalgic gait, and normal station.  (Id. at 456).  Dr. Stone further noted that Plaintiff was oriented and had normal mood, appropriate affect, and intact insight and judgment.  (Id. at 456-57).  X-rays of Plaintiff's lumbar spine showed L5-S1 spondylosis and degenerative disc disease.  (Id. at 457).  Dr. Stone indicated that Plaintiff would get a lumbar spine MRI (id.), but the record does not reflect that a lumbar spine MRI was ever performed.  Plaintiff "defer[red] surgical evaluation for his knee," and Dr. Stone continued him on Norco and Gabapentin.  (Id.).

Plaintiff last presented to Dr. Stone on November 1, 2019, complaining of chronic right knee and lower back pain and requesting that Dr. Stone fill out disability paperwork.[16]  (Id. at 452).  Dr. Stone's physical examination findings from that date were normal, except for a flesh-colored lesion under Plaintiff's

_____

(Id.).

[16] Dr. Stone informed Plaintiff that "we do not fill out paperwork." (Doc. 13 at 452).

right eye.  (See id. at 453-54).  Dr. Stone continued to indicate that a lumbar spine MRI was needed and advised Plaintiff to consider a spinal injection pending imaging results.  (Id. at 454). He also discussed the option of a right knee Synvisc injection, but Plaintiff deferred, and his current medications were refilled. (Id.).

The record also contains treatment records from AltaPointe Health Systems ("AltaPointe") from November 14, 2017 through May 17, 2019.  The records reflect that Plaintiff was seen at AltaPointe by psychiatrist William Brooks, M.D., and psychiatry residents Griffin Gibson, M.D., and Peyman Tashkandi, D.O.  (See id. at 335-45, 356-61, 383-89).  Plaintiff initially reported that he was not sure of the services he was seeking, but he went on to report depression symptoms, including lack of energy, inability to sleep, and poor appetite, caused by his financial situation and lack of income for three years.  (Id. at 400).  A mental status examination at Plaintiff's initial visit reflected that his thought processes were logical; he had no delusions or hallucinations; his associations were circumstantial; his insight and judgment were good; he was alert and oriented; his memory and attention were intact; he was able to name objects and repeat phrases correctly; his fund of knowledge was intact considering his education level; his mood was normal; his affect was appropriate to situation; he displayed no agitation or

23

retardation; and he was cooperative and showed good reliability. (Id. at 402-03).

During a February 6, 2018 psychiatric visit, Plaintiff reported depressive symptoms including anhedonia, decreased energy, fatigue, decreased appetite, lack of libido, and chronic problems with sleep secondary to nightmares. (Id. at 384). Upon examination, it was noted Plaintiff's hygiene and grooming were fair; his clothing was disheveled; he walked with a right-sided limp; his rate of thought was normal;[17] no delusions were present; his associations were linear; his insight and judgment were good; he was alert and oriented; his immediate, recent, and remote memory appeared intact; his attention and concentration appeared intact; his mood was sad/depressed; his affect was appropriate to situation; his eye contact was normal; psychomotor retardation was noted; and he was cooperative and showed good reliability. (Id. at 387-88). Plaintiff was diagnosed with major depressive disorder, single episode, severe; nicotine use disorder; and right knee injury/pain. (Id. at 385, 388). He was started on Mirtazapine for depression and insomnia. (Id. at 385).

The records reflect that Plaintiff reported overall improvement on Mirtazapine, although his dosages were increased

---

[17] It was noted that Plaintiff reported having some passive death wishes over the past two years but denied having a passive death wish presently and denied suicide or homicide ideation. (Doc. 13 at 384, 387-88).

over time, and he was prescribed medication for insomnia.  (See id. at 336-37, 341-42, 348, 358, 371-72, 377).  At his final recorded date of treatment[18] at AltaPointe on May 17, 2019, Plaintiff reported some improvement in his mood, sleep, and appetite.  (Id. at 336).  His mental status examination was essentially normal, although his hygiene and grooming were listed as only fair.  (See id. at 338-39).  Dr. Tashkandi directed Plaintiff to continue his current medications.  (Id. at 337).

During the May 2019 visit, Dr. Tashkandi completed a supplemental questionnaire addressing Plaintiff's mental residual functional capacity.  (Id. at 301-02).  Dr. Tashkandi opined that Plaintiff's estimated restrictions of activities of daily living, degree of difficulty in maintaining social functioning, and estimated deficiencies of concentration, persistence, or pace were slight to moderate.  (Id. at 301).  Dr. Tashkandi also opined that Plaintiff had one or two "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)".  (Id.).  He further opined

---

[18] Plaintiff presented for a follow-up appointment at AltaPointe on July 25, 2019, but he had to reschedule because he did not have his copayment.  (Doc. 13 at 332).  A medication management appointment was scheduled for September 27, 2019, but Plaintiff did not show up for that appointment.  (Id. at 329).

that Plaintiff had slight to moderate limitations in his abilities to understand, carry out, and remember instructions in a work setting, respond appropriately to supervision in a work setting, perform simple tasks in a work setting, and perform repetitive tasks in a work setting; and slight to no limitations in his ability to respond appropriately to co-workers in a work setting. (Id. at 301-02). Dr. Tashkandi opined that Plaintiff's conditions had existed at the same level of severity beginning three years prior to his presentation to AltaPointe but stated that Plaintiff's "first documented episode" was in February 2018. (Id. at 302).

Dr. Tashkandi also added the following comments to the questionnaire:

> Patient has been battling w/ depression for the past one year (that is documented) he has been treated with medications to address the depressive symptoms of anhedonia; depressed mood; decreased energy; decreased appetite & lack of concentration & attention. He has had moderate response to the regimen; however insomnia has persisted. Physical ailment, especially pain has contributed significantly to his mental health & has directly impacted his functionality in social & interpersonal settings. There has not been any psychological testing, but patient has been coming to his sessions regularly following treatment recommendations & has shown some improvement, d[e]spite moderate presence of symptoms. Patient's physical ailment in my assessment, has put significant burden on his mental health; however I am evaluating the patient on psychiatric goals only.

(Id.).

C. ***Substantial Evidence Supports the ALJ's Evaluation of Dr. Mitchell's Opinions.***

Plaintiff contends that the ALJ erred in his evaluation of Dr. Mitchell's opinions because he failed to adequately explain or identify specific evidence supporting his findings that Dr. Mitchell's opinions were unsupported by or inconsistent with the medical evidence of record. (Doc. 14 at 5). The Court finds this assertion unfounded, as it disregards the thorough discussion of the record evidence that immediately preceded the ALJ's evaluation of Dr. Mitchell's opinions.

With respect to Dr. Mitchell's Medical Assessment Report dated December 15, 2017, the ALJ stated:

> Dr. Mitchell completed an medical source statement [sic] in December 2017, after this initial visit with the claimant. She opined that the claimant cannot perform normal work related activities for 6 to 8 hours a day and that the claimant could be expected to miss four or more days of work per month. This opinion is not persuasive because it is not supported by Dr. Mitchell's treatment records or the record as a whole, including diagnostic testing and examination findings. Additionally, it is conclusory and based on just one office visit.

(Doc. 13 at 21) (internal record citation omitted).

The ALJ then addressed the PCE and Clinical Assessment of Pain forms completed by Dr. Mitchell in May 2019:

> Dr. Mitchell completed a physical capacities evaluation (PCE) form in May 2019 in which she opined that the claimant can sit for three hours in an eight-hour workday, stand for one hour, and walk for one hour among other limitations. Dr. Mitchell also completed a pain form in which she opined that the claimant is unable to

> work due to pain.  Dr. Mitchell's opinions are not
> persuasive because they are not supported by her own
> treatment records, which document minimal findings on
> exam and imaging, and Dr. Mitchell has only seen the
> claimant a few times for treatment.  Dr. Mitchell's
> opinions are also not consistent with the record as a
> whole.

(Id. at 22) (internal record citations omitted).

In explaining his RFC determination, the ALJ set forth a detailed summary of the medical and other evidence of record, and in doing so provided substantial evidentiary support for his subsequent evaluation of Dr. Mitchell's opinions.  For example, the ALJ noted that when Plaintiff initially sought treatment for a right knee injury in 2014 and 2015, imaging results were normal, and Dr. Cockrell, the treating orthopedist, could "find no clinical reasons to explain his complaints or symptoms."  (See id. at 19, 267, 278, 309).  The ALJ recognized the lengthy gap in treatment for Plaintiff's knee between his discharge from Dr. Cockrell's treatment in 2015 and his consultative medical examination in September 2017.[19]  (See id. at 19, 267, 292).  The ALJ also cited the results of Plaintiff's consultative medical examination, including his normal stride, speed, and gait with the exception of the use of a right knee brace; full lower extremity strength; well-

---

[19] When Plaintiff presented to American Family Care on March 27, 2017, he complained only of vomiting and abdominal pain, and it was noted on examination that his gait and stance were normal, his sensory exam was normal throughout, and his strength and motor skills were normal bilaterally.  (Doc. 13 at 303-04).

developed musculature of both thighs in spite of decreased right knee flexion; and entirely normal back examination, as well as the examiners' finding of "few objective physical limitations to activities or restrictions in mobility." (See id. at 19-20, 293-94).

The ALJ then addressed Plaintiff's treatment with Dr. Mitchell, which began on December 15, 2017 and continued on an infrequent basis thereafter. (See id. at 20, 310-22). The ALJ noted that Plaintiff reported mild back pain during his initial visit to Dr. Mitchell, but Dr. Mitchell identified no back-related abnormalities, and lumbar spine x-rays showed only minimal degenerative changes. (See id. at 20, 316-17). The ALJ also noted that although Plaintiff was unable to bend his right knee on examination, x-rays showed an intact patella and no large joint effusion. (See id. at 20, 317-18, 321). After establishing treatment with Dr. Mitchell in December 2017, Plaintiff followed up with her only twice. (See id. at 310-16). On both of those occasions, Dr. Mitchell's physical examination findings were entirely normal. (See id. at 311, 315). Indeed, at Plaintiff's most recent office visit on April 30, 2019, Dr. Mitchell noted that Plaintiff had normal range of motion, no edema or deformity, normal reflexes, and normal coordination. (Id. at 311).

The ALJ also discussed Plaintiff's two dates of orthopedic treatment with Dr. Zarzour. (Id. at 20). The ALJ noted that

January 2018 right knee x-rays showed only mild osteoarthritis with subchondral sclerosis, and lumbar spine x-rays showed mild degenerative disc disease at L5-S1 with subchondral sclerosis. (See id. at 20, 468). The ALJ also noted Dr. Zarzour's conservative treatment of Plaintiff with medication, injections, physical therapy, and a right knee brace, as well as the fact that Plaintiff did not return to Dr. Zarzour for further orthopedic treatment after receiving injections in March 2018. (See id. at 20, 464-69).

Finally, the ALJ discussed Plaintiff's pain management treatment with Dr. Stone. (Id. at 20). The ALJ noted that a July 2019 right knee MRI showed a partial ACL tear and thinning of the medial patella cartilage, and that an additional lumbar spine x-ray showed L5-S1 spondylosis and degenerative disc disease. (See id. at 20, 457-58). The ALJ summarized Dr. Stone's physical examination findings, including no erythema, swelling, redness, crepitus, or instability of the right knee, minimal tenderness of the right knee, and reduced right knee range of motion. (See id. at 20, 462). The ALJ also noted that Dr. Stone's initial examination of Plaintiff showed full lumbosacral spine range of motion and negative bilateral straight leg raise, but a subsequent examination showed reduced lumbosacral spine range of motion and pain with range of motion, positive right-sided straight leg raise, positive facet-loading maneuvers, and antalgic gait with normal

station.   (See id. at 20, 456, 462).   The ALJ further noted Dr. Stone's conservative treatment of Plaintiff with medications, the fact that Plaintiff declined a Synvisc injection in his right knee in November 2019, and the lack of any surgical recommendation. (See id. at 20, 454, 457, 462).

The ALJ acknowledged that Dr. Stone's "findings from examination and testing document some worsening of the claimant's musculoskeletal conditions[.]"   (Id. at 20).   However, the ALJ observed that Plaintiff continued to receive only conservative treatment, that he had not required emergency room treatment or hospitalization for knee or back issues, and that surgery had not been recommended for Plaintiff's knee or back impairments.   (Id.). Indeed, the record reflects that Plaintiff deferred surgical evaluation and declined an additional injection for his right knee, despite the fact that a prior right knee injection had reportedly afforded him good relief for one to two months.   (See id. at 454, 457, 460).   The record also reflects that despite his alleged difficulty with flexion of his right knee, Plaintiff failed to complete his prescribed physical therapy regimen, attending only three out of thirteen planned sessions.   (See id. at 19, 292).

The ALJ also pointed out that there were no documented complaints of knee or back pain during Plaintiff's hospital admission in November 2018, and no mention of gait disturbance or other musculoskeletal abnormalities.   (Id. at 21).   On the

contrary, Plaintiff was noted to move all extremities well, walk frequently, and have no mobility limitations, and he demonstrated full range of motion, normal gait, and good muscle strength in all extremities on examination.  (Id. at 423, 428, 440, 442, 450).

The ALJ further cited Plaintiff's function report, which indicated that he was able to clean, do laundry, wash dishes, prepare "complete meals with [several] courses" on a daily basis, feed and water pets, drive a car, travel alone, shop, and go outside ten to twelve times a day to smoke cigarettes.  (See id. at 21, 204-13).

The foregoing evidence, which the ALJ discussed in detail immediately prior to assessing Dr. Mitchell's opinions, adequately supports and explains the ALJ's finding that Dr. Mitchell's opinions were not persuasive.  With respect to Dr. Mitchell's Medical Assessment Report dated December 15, 2017, the ALJ correctly noted that the opinions rendered therein were conclusory and based on only one office visit.  (See id. at 21, 297, 316-18).  Dr. Mitchell provided no support or explanation for her statement that Plaintiff's onset date of disability was October 30, 2014, or for her checkmark opinions that Plaintiff could not perform normal work-related activities for six to eight hours in an average workday and could be expected to miss four or more days of work per month.  (See id. at 297).  Moreover, the regulations provide that "[s]tatements on issues reserved to the Commissioner[,]"

including "[s]tatements that you are or are not disabled, . . . able to work, or able to perform regular or continuing work[,]" constitute evidence that "is inherently neither valuable nor persuasive to the issue of whether you are disabled . . . under the Act[.]"   20 C.F.R. § 404.1520b(c)(3).   Dr. Mitchell's statements regarding Plaintiff's disability onset date and inability to perform normal work-related activities were statements on issues reserved to the Commissioner that were inherently neither valuable nor persuasive to the issue of whether Plaintiff is disabled.  See id.  The Court also notes that Dr. Mitchell's opinion that Plaintiff would require monthly follow-up treatment is belied by the record, which reflects only sporadic follow-up treatment with substantial gaps.

The thorough discussion of the record evidence earlier in the ALJ's decision also provides adequate support for the ALJ's findings that Dr. Mitchell's opinions in the May 2019 PCE and Clinical Assessment of Pain forms are not persuasive.  First, the ALJ correctly noted that Dr. Mitchell's opinions are not supported by her own treatment records, because she treated Plaintiff on only a few occasions and her treatment records (which the ALJ had summarized two pages earlier) document minimal findings on imaging and physical examination.  (See Doc. 13 at 20, 22, 310-22). Second, the ALJ's discussion of the record evidence in its entirety, including Plaintiff's sporadic and conservative

treatment, Plaintiff's largely unremarkable imaging results and frequently unremarkable physical examination findings, the fact that Plaintiff did not report knee or back pain or demonstrate any difficulty with movement during his 2018 hospital admission, and Plaintiff's ability to perform activities such as cooking, cleaning, shopping, and driving, amply supports the ALJ's conclusion that the extreme restrictions listed by Dr. Mitchell are inconsistent with the record as a whole. (See id. at 19-22).

Dr. Mitchell's opinions are rendered in the form of circles or checkmarks, with minimal[20] explanation or support.[21] (See id. at 298-300). In addition to being conclusory, certain opinions rendered by Dr. Mitchell are blatantly contradicted by the record. For example, when asked to indicate the extent side effects of prescribed medication would impact Plaintiff's ability to perform work activity, Dr. Mitchell circled the answer stating: "Patient

---

[20] The only explanation for any of the checked or circled answers provided in either of the forms completed in May 2019 is Dr. Mitchell's statement that Plaintiff "is currently in pain management." (See Doc. 13 at 298-300).

[21] See Burgin v. Comm'r of Soc. Sec., 420 F. App'x 901, 903 (11th Cir. 2011) (per curiam) (stating that the Appeals Council "was free to give little weight to the conclusory assertions" contained in medical questionnaires completed by the claimant's health care providers "because they merely consisted of items checked on a survey, with no supporting explanations"); Hammersley v. Astrue, 2009 U.S. Dist. LEXIS 92697, at *20, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("[C]ourts have found that check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.").

will be totally restricted and thus unable to function at a productive level of work." (Id. at 299). But the record reflects that Plaintiff experienced minimal, if any, side effects from his medications. Dr. Stone noted that Plaintiff's current pain medication caused *no* side effects, and that Plaintiff *could* perform various activities "*due to* current pain medication relief[.]" (Id. at 452, 455) (emphasis added). Plaintiff denied medication side effects during his last visit to AltaPointe. (Id. at 336). And, when asked at his hearing whether he had any side effects from his medication, Plaintiff responded: "Just my pain medication a little. . . . It just makes me a little dizzy." (Id. at 49). Similarly, there is little or nothing in the record to support Dr. Mitchell's conclusion that Plaintiff cannot use his *left* foot for repetitive movements, and Dr. Mitchell's total restriction of activities involving driving automotive equipment is refuted by the fact that *Plaintiff drove himself to the disability hearing*. (See id. at 42-43, 300).

In sum, the ALJ's detailed discussion of the record evidence in connection with the RFC determination provides ample explanation and substantial evidentiary support for his subsequent conclusion that Dr. Mitchell's opinions are not persuasive because they are conclusory, based on only one or a few dates of treatment, unsupported by her own treatment records, and inconsistent with the record as a whole. Accordingly, the ALJ did not err in his

assessment of Dr. Mitchell's opinions.

> **D.    *Substantial Evidence Supports the ALJ's Evaluation of Dr. Tashkandi's Opinions.***

Plaintiff alleges that the ALJ "cherry picked" by finding most of Dr. Tashkandi's opinions to be persuasive but finding the opinion regarding the frequency of episodes of deterioration or decompensation, which Plaintiff alleges supports his disability claim, to be unpersuasive. (Doc. 14 at 5).  The Court finds this accusation unwarranted, as the record supports the ALJ's conclusion that Dr. Tashkandi's opinion regarding episodes of deterioration or decompensation is not supported by Plaintiff's conservative treatment and overwhelmingly normal mental examination findings.

The ALJ assessed Dr. Tashkandi's opinions as follows:

> The claimant's treating mental health provider completed a mental residual functional capacity questionnaire in May 2019 in which he opined that the claimant has only slight to moderate mental limitations.  The claimant's treating provider indicated that the claimant has had one to two episodes of deterioration in work or work-like settings.  The opinion concerning the slight to moderate limitations are persuasive because they are consistent with the findings from examination and the mental health records.  The opinion regarding the frequency of deterioration/decompensation, however, is not persuasive because it is not supported by the record, including the conservative treatment and the normal findings on examination.

(Doc. 13 at 22) (internal record citation omitted).

With respect to episodes of deterioration or decompensation, Dr. Tashkandi circled "ONE OR TWO" on the supplemental

questionnaire.[22]   (Id. at 301).   The questionnaire did not define
the term "episodes of deterioration or decompensation," and Dr.
Tashkandi did not explain how he interpreted the term.   (See id.
at 301-02); but see Santos v. Soc. Sec. Admin., Comm'r, 731 F.
App'x 848, 855 (11th Cir. 2018) (per curiam) ("Episodes of
decompensation are exacerbations or temporary increases in
symptoms or signs accompanied by a loss of adaptive functioning,
as manifested by difficulties in performing activities of daily
living, maintaining social relationships, or maintaining
concentration, persistence, or pace.") (quoting 20 C.F.R. § 404,
Subpart P, App. 1 § 12.00(C)(4) (2016)); Waydick v. Astrue, 2012
U.S. Dist. LEXIS 110406, at *32-33 n.11, 2012 WL 3206802, at *11
n.11 (N.D. Fla. July 5, 2012) ("Episodes of decompensation may be
inferred from medical records showing significant alteration in
medication; or documentation of the need for a more structured
psychological support system (e.g. hospitalizations, placement in
a halfway house, or a highly structured and directing household);

---

[22] Specifically, the multiple-choice question regarding episodes
of deterioration or decompensation stated:

  4. EPISODES OF DETERIORATION OR DECOMPENSATION IN WORK
  OR WORK-LIKE SETTINGS WHICH CAUSE THE INDIVIDUAL TO
  WITHDRAW FROM THAT SITUATION OR TO EXPERIENCE
  EXACERBATION OF SIGNS AND SYMPTOMS (WHICH MAY INCLUDE
  DETERIORATION OF ADAPTIVE BEHAVIORS):

    NONE      ONE OR TWO     THREE     FOUR OR MORE

(Doc. 13 at 301).

or other relevant information in the record about the existence, severity, and duration of the episode.") (quoting 20 C.F.R. § 404, Subpart P, App. 1 § 12.00), report and recommendation adopted, 2012 U.S. Dist. LEXIS 110410, 2012 WL 3206490 (N.D. Fla. Aug. 6, 2012).

The Court finds that the ALJ properly determined that the record does not support Dr. Tashkandi's assertion that Plaintiff had experienced or would experience one or two episodes of deterioration or decompensation in a work-like setting. As an initial matter, the record reflects that Plaintiff presented to AltaPointe in November 2017 not to address any particular mental health problem, but instead "for [his] disability claim." (Id. at 400). Although Plaintiff reported symptoms of depression and insomnia, he attributed his depression primarily to his financial straits and lack of income rather than any underlying psychological impairment. (See id. at 357, 400).

Second, the results of Plaintiff's mental status examinations at AltaPointe were overwhelmingly normal (see id. at 343-44, 349-50, 359-60, 380-81, 387-88, 402-03), and the psychiatric or mental examination findings of Plaintiff's treating or examining medical providers were *uniformly* normal. (See id. at 269, 293, 304, 311, 315, 317, 423, 434, 442, 453, 456-57, 461, 465, 468). Notably, Plaintiff denied depression during his hospital admission in November 2018 (id. at 423), and his review of systems was negative

38

for psychiatric/behavioral problems during his last visit to Dr. Mitchell in April 2019.  (Id. at 310).

Third, Plaintiff's psychiatric treatment remained conservative and relatively consistent.  As the ALJ noted, Plaintiff declined to participate in therapy and did not require inpatient psychiatric treatment.  (See id. at 21, 336, 396). Instead, Plaintiff was treated with medication for depression and insomnia and reported some improvement.  Plaintiff remained on a single medication (Mirtazapine) for depression throughout his treatment at AltaPointe,[23] albeit with two increases in dosage. (See id. at 337, 342, 348, 351, 358, 361, 372, 378, 385, 389).  On his last date of treatment at AltaPointe, Plaintiff reported some improvement in his mood, sleep, and appetite, and Dr. Tashkandi directed Plaintiff to continue his current medications.  (Id. at 336-37).

Finally, the record reflects that Plaintiff performs daily activities independently, has never experienced a significant alteration in his psychiatric medication or other mental health treatment, and has never required psychiatric hospitalization, placement in a halfway house, or a more structured household

---

[23] Plaintiff was repeatedly instructed to consider augmentation with Cymbalta or Effexor in the future for depression and chronic pain if Mirtazapine alone did not manage his depression.  (Doc. 13 at 337, 342, 348, 358, 372, 378, 385).  However, Plaintiff remained on Mirtazapine and did not augment that medication with Cymbalta or Effexor.  (See id.).

setting.    The   record   does   not   suggest   that   Plaintiff   has
difficulties maintaining social relationships; on the contrary, it
reflects   that   Plaintiff   is   pleasant   and   cooperative,   has   no
difficulty getting  along  with  others,  lives  with  and  maintains
relationships  with  his  wife  and  adult  children,  talks  on  the
telephone,  and  visits  his  father's  house  regularly.   (See  id.  at
42, 204, 210-12, 293, 339, 403).   The record further reflects that
Plaintiff's   attention   and   concentration   are   intact,   that   he   can
pay  attention  as  long  as  necessary,  and  that  he  finishes  what  he
starts.  (Id. at 211, 339, 344, 350, 360, 380, 384, 388, 402).   It
is  also  noteworthy  that  despite  being  represented  and  questioned
by  counsel  during  his  administrative  hearing,  Plaintiff  did  not
mention  depression  or  any  other  mental  health  issue  during  his
testimony.  (See id. at 41-49).

Thus, the ALJ had ample reason to find Dr. Tashkandi's opinion
regarding   the   frequency   of   episodes   of   deterioration   or
decompensation  to  be  unpersuasive,  as  there  is  simply  no  evidence
of  any  episode  of  deterioration  or  decompensation,  "a  rather
serious  manifestation  of  mental  symptoms."   Waydick,  2012 U.S.
Dist. LEXIS 110406, at *31, 2012 WL 3206802, at *11.  Nor does the
evidence  reasonably  suggest  the  likelihood  of  any  such  future
episode.   The  ALJ  adequately  explained  his  finding  by  citing
Plaintiff's  conservative  treatment,  which  included  medication
management  services  but  no  counseling,  therapy,  or  inpatient

treatment, and Plaintiff's overwhelmingly normal mental examination findings. Accordingly, the ALJ did not err in his assessment of Dr. Tashkandi's opinions.

### E.   Substantial Evidence Supports the ALJ's Evaluation of Dr. Harper's Opinions.

Plaintiff also contends that the ALJ erred in finding the State agency medical reviewer's opinion that Plaintiff can perform a reduced range of light work to be persuasive. (Doc. 14 at 6). Specifically, Plaintiff asserts that the opinion was unsupported and "premature" because it was rendered in October 2017, before he received the vast majority of his medical treatment. (Id.). Plaintiff also claims that the ALJ erred by failing to delineate how the opinion was consistent with the record evidence. (Id.).

The record reflects that on October 2, 2017, Howard C. Harper, Jr., M.D., the non-examining State agency medical consultant, completed a Physical Residual Functional Capacity Assessment based on his review of Plaintiff's medical records then available. With regard to Plaintiff's exertional limitations, Dr. Harper opined that Plaintiff could lift and/or carry up to twenty pounds occasionally and up to ten pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and was unlimited in his abilities to push and pull except for the stated lift/carry limitations. (Doc. 13 at 60). As to postural

limitations, Dr. Harper stated that Plaintiff could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, and crawl; and was unlimited with respect to balancing.  (Id. at 60-61).  Dr. Harper opined that Plaintiff had no manipulative limitations and no environmental limitations, except that he could not have concentrated exposure to hazards, including unenclosed heights. (Id. at 61).

In assessing Dr. Harper's opinions, the ALJ stated: "The Disability Determination Services physician opined that the claimant is able to perform a reduced range of light work.  This opinion is persuasive because it is consistent with the record as a whole, including the findings from examination and testing and the conservative treatment prescribed."  (Id. at 22) (internal record citation omitted).

To the extent Plaintiff argues that the ALJ did not sufficiently explain his finding that Dr. Harper's opinion is consistent with the record as a whole, that assertion is without merit.  The ALJ explained this finding by pointing to Plaintiff's examination findings and conservative treatment, which he had thoroughly summarized just prior to his evaluation of the opinion evidence and was not required to perfunctorily repeat.  (See id. at 19-22).  As set forth in greater detail above, despite Plaintiff's rather severe subjective allegations, his treatment

42

for back and knee complaints was irregular and conservative, consisting of medication, a couple of injections, physical therapy (which he did not complete), and bracing.  The record suggests that Plaintiff's medication was quite effective in providing relief, with few, if any, side effects.  (See id. at 452, 455) (noting that Plaintiff had "66-85%" relief and no side effects from his current pain medication and could perform activities including shopping, social outings, cooking, childcare, hobbies, and personal hygiene due to current pain medication relief).  The record also reflects that despite reportedly getting good temporary relief from his March 2018 knee injection,[24] Plaintiff deferred a Synvisc injection offered by Dr. Stone and declined surgical evaluation.  (See id. at 454, 457).  Additionally, as the ALJ recognized, the physical examination findings in the record, considered as a whole and in connection with Plaintiff's continued conservative treatment, are more consistent with the RFC for a reduced range of light work than with Plaintiff's subjective allegations.

The ALJ also made note of Plaintiff's reported activities, which include preparing full meals, cleaning and performing other

---

[24] The Court notes that after receiving injections in his knee and back in March 2018, Plaintiff did not return to Dr. Zarzour for further orthopedic treatment and did not obtain *any* further office treatment relating to his knee or back until April 2019 at the earliest.  (See Doc. 13 at 310, 460, 465).

household chores, shopping, and driving, and the ALJ specifically stated that these activities were "consistent with the residual functional capacity" for a reduced range of light work. (See id. at 21).

The decision reflects that the ALJ did not place undue reliance on Dr. Harper's prior administrative medical findings from October 2017, but instead found Dr. Harper's assessment to be persuasive because of its general consistency with the record evidence as a whole, including Plaintiff's conservative and sporadic treatment, often unremarkable examination findings, and relatively extensive daily activities. As explained above, the ALJ's thorough discussion of the evidence in connection with the RFC determination adequately explains and provides substantial evidentiary support for this conclusion. Accordingly, the ALJ did not err in finding Dr. Harper's prior administrative medical findings to be persuasive.

For the reasons set forth above, the Court finds that the ALJ's evaluation of the medical opinion evidence and prior administrative medical findings is supported by substantial evidence, and that the ALJ's decision cites sufficient evidence to support the RFC for a reduced range of light work. Indeed, Plaintiff has not identified any limitations caused by his impairments that exceed the RFC and are not accommodated by the

restrictions contained therein.[25]   Accordingly, Plaintiff's claim must fail.

## VIII.   <u>Conclusion</u>

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability and disability insurance benefits be **AFFIRMED**.

**DONE** this **23rd** day of **March, 2022.**

/s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**

---

[25] Although Plaintiff has cited evidence in the record which he claims supports a finding that he is disabled, that is, at best, a contention that the record evidence supports a different finding. That is not the standard on review.  The issue is not whether there is evidence in the record that would support a different finding, but whether the ALJ's finding is supported by substantial evidence. See Figueroa v. Comm'r of Soc. Sec., 2017 U.S. Dist. LEXIS 181734, at *15, 2017 WL 4992021, at *5 (M.D. Fla. Nov. 2, 2017) ("Although Plaintiff cites to certain test results, notes, and physical therapy findings as support for her contention that 'there were objective medical findings that support the doctor's opinions about [her] limitations' . . ., this is, at best, a contention that the record could support a different finding.  This is not the standard on review. The issue is not whether a different finding could be supported by substantial evidence, but whether this finding is.") (emphasis in original).